UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
MYRA RUDT-POHL,

                    Plaintiff,

              -against-

MICHAEL J. ASTRUE
COMMISSIONER OF SOCIAL
SECURITY,

                    Defendant.
-----------------------------------------------------------------X

**MEMORANDUM & ORDER**

07 CV 5019 (RJD)

DEARIE, Chief Judge.

Plaintiff, a 65 year-old woman, originally filed for Social Security disability payments on May 19, 2000, alleging disability since January 15, 1997, as a result of a combination of maladies including a severe latex allergy, "Ateriorsclerotic Heart Disease with Angina, Arrythmias, Diabetes Mellitus with neuropathy, depression, chronic obstructive pulmonary disease and pains throughout her body." Tr. 10. Plaintiff's date last insured (DLI) was March 30, 2002. Tr. 328. She graduated from Queensboro Community College, and previously worked as a licensed practical nurse (LPN) and an Office Manager in a medical office. Tr. 11.

After initial denials, plaintiff's claim was heard by Social Security Administrative Law Judge David Nisnewitz on August 20, 2001, and that hearing continued on September 10, 2001. Tr. 40-177. The ALJ denied plaintiff's claim on March 20, 2002. After denial by the Appeals Council, plaintiff timely filed in this Court on October 27, 2003. The parties agreed to a remand for further development of the record, and entered into a stipulation endorsed by the Court on October 14, 2004. Three more hearings were held by the ALJ, and plaintiff's claim was again denied, on August 29, 2007. Plaintiff filed this action on December 4, 2007.

# BACKGROUND

## I. Medical Evidence

Plaintiff's medical record documents a number of conditions apart from her latex allergy, including thyroid disease, tachycardia, chronic pulmonary disease, diabetes, and neuropathy. The only aspect of the ALJ's decision in dispute, however, relates to the severity of plaintiff's latex allergy. Accordingly, the medical evidence summarized below pertains primarily to that sensitivity.

### A. *Dr. John Rawlings, plaintiff's internist*

Dr. Rawlings is plaintiff's internist, who she has seen regularly since 1986. In a medical report prepared on July 9, 2001, he reported that plaintiff had a severe latex allergy. Tr. 285. Furthermore, he stated that "[e]xposure to common presence of latex – an almost universally present substance would necessitate increased use of Prednisone, Bronchodilators, epipen and provide basis for increase in recurring anxiety." Tr. 285. Significantly, he noted that plaintiff had "extreme anxiety due to Latex sensitivity[,]" a fact that does not appear in issue. Tr. 285.

In August 2005, Rawlings again noted that plaintiff had "severe, recurring, unpredictable Bronchospasm, incapacitating with documented anaphylactic reactions with minimal exposure to Latex." Tr. 546. His prognosis was "guarded." Tr. 545.

### B. *Dr. Larry Bernstein, plaintiff's allergist*

Dr. Bernstein, plaintiff's allergist, diagnosed her latex allergy in 1997, noting in a 2000 report that she wheezes upon exposure to latex. Tr. 233-236.

### C. *Dr. Richard Ores, defendant's consultative expert*

Dr. Ores is a non-examining expert who testified for defendant at the September 10, 2001

hearing. Tr. 106-74. Ores concluded that plaintiff's primary problem was her thyroid condition, but that none of her ailments met the disability requirements. Tr. 113. He did not even address her latex allergy.

### D. *Dr. Marilee Mescon, defendant's examining expert*

Dr. Marilee Mescon is a consulting internist for defendant, who examined plaintiff once on June 30, 2005. She found that plaintiff had a latex allergy that caused upper airway obstruction, and that her long-term prognosis was poor. Tr. 530. She further stated that because "of claimant's breathing problems, she should not be in environments where she is exposed to toxic dust, fumes, and chemicals; because of the Raynaud's phenomenon in her finger, she should not be in cold environments; because of her latex allergies should be nowhere near where latex is found." Tr. 531.

### E. *Dr. Vern O. Laung, defendant's consultative allergist*

Dr. Laung is a consulting, non-examining allergist for defendant who testified at the May 8, 2007 hearing. Dr. Laung noted the following: "[W]hat evidence other than testimonial and an opinion by a non-allergist, what evidence do we have that she truly has a latex allergy. This is a disease process by which one can test and it's also a disease process by which one can challenge." Tr. 726. He further stated: "I see where the doctor says she has it. I see where she says she has it, but I would like to see more objective evidence." Tr. 726.

Laung testified that there are different ways to test for a latex allergy. With a fair degree of certainty, a blood test could confirm the presence of the allergy. Also, a skin puncture test provides greater reliability but presents some danger to a patient afflicted with a latex allergy. Laung also indicated that he had never heard of an airborne latex allergy as alleged by plaintiff.

3

Tr. 727. He also stated that these types of severe latex allergies are extremely rare, and he would only see a few of these in his lifetime. Tr. 727. He further suggested that because he was not an expert on latex allergies, the ALJ should contact Dr. Dennis Ownby in Georgia for his expert opinion. Tr. 727.

### F. Dr. Dennis Ownby, defendant's consultative allergist

The ALJ provided the medical record to Dr. Dennis Ownby, an expert on latex allergies at the Medical College of Georgia. Dr. Ownby confirmed that there are two tests for detecting latex allergies, but the blood serum test fails to detect 10-30% of individuals with the allergy. Tr. 606. Ownby further stated that "because of these diagnostic limitations some studies have been done involving direct challenge of individuals with latex attached to airborne particles. Objectively documented changes in lung function or photographically documented facial swelling have been the primary criteria for a positive response to such challenges." Tr. 606. Ownby notes, however, that many people claiming to have latex allergies will refuse to have such tests because they are afraid they will have a fatal reaction. Tr. 606.

Dr. Ownby notes the lack of objective information or diagnoses in the medical record, and finds the record "grossly inadequate to document type I latex allergy in the claimant." Tr. 606. Ownby concluded that "the record clearly indicates that the claimant has multiple medical problems but I do not think that there is adequate information to substantiate a diagnosis of type I latex allergy." Tr. 607.

### G. Dr. Bernard Gussoff, defendant's non-examining consultative expert

Dr. Gussoff did not examine plaintiff. He was present at the April 24, 2006 hearing during which plaintiff appeared to have a violent allergic reaction upon entering the room, and

4

left immediately. Tr. 643. Gussoff's initial statement to the Court was as follows:

> My opinion is that maybe with possibly from the cardiac point of view she meets the listing, but cumulatively, she meets the equivalent of listings, and her residual functional capacity is less than sedentary. I must hasten to add what I just witnessed, and what is well documented in the listing is that there are two things that threaten her life on any moment to moment basis. The recurrent ventricular tachycardia which Dr. Rollings (sic) documents in I think it is 6E, as well as the latex allergy which we have just witnessed, which can occur at any time without any warning, and without being aware of the noxious agent that precipitates the attack. But all it takes apparently is some residual latex particle whenever or wherever.

Tr. 644.

Gussoff testified again at the July 12, 2006 hearing. He indicated that plaintiff's latex allergy indeed met a disability listing. Tr. 704. Gussoff testified that be believed that there was enough evidence, based on seeing her attack in the hearing room and the notes of Dr. Rawlings, to conclude that the latex allergy severely affects plaintiff. Tr. 707. Gussoff concluded that if plaintiff could be guaranteed a latex-free environment, she would be employable, but also noted that anyone, anywhere could walk into her workplace with latex. Tr. 715.

**II. Non-Medical Evidence**

A. *Plaintiff's Testimony*

Plaintiff testified at four different hearings – two prior to her initial denial by the ALJ, and two after the stipulated remand. Tr. 40-95; 96-174; 673-720; 720. Another hearing was convened on April 25, 2006, but plaintiff had an "attack of shortness of breath and wheezing." Tr. 643. That hearing continued without plaintiff. Id.

Defendant's memorandum provides a balanced recitation of plaintiff's testimony, and plaintiff incorporates defendant's summary of this testimony by reference in plaintiff's own brief.

5

The summary states, in pertinent part:

> During the August 20, 2001 hearing, plaintiff claimed to have an allergic reaction to a rubber band in the room. Tr. 58-59. Plaintiff had not been tested for a latex allergy because she feared having an anaphylactic reaction; she last saw an allergist three years earlier. Tr. 60-61. Her first allergic reaction occurred while blowing up a glove when she was working as a nurse in a medical office. Tr. 62. She was not sure if her reaction was an anaphylactic allergic reaction or an asthma attack. Tr. 65-66. She also reported she had a reaction when she spoke with her attorney in his office, which she treated with Albuterol. Tr. 91-92
>
> Plaintiff testified that she had a heart condition that caused ventricular tachycardia and an autoimmune thyroid disease. Tr. 64, 67. Since she started taking medication for her heart condition, it had been under control (Tr. 68), but her medication caused peripheral neuropathy, balance problems, and memory problems. Tr. 73. Plaintiff reported that she also had diabetes, which was controlled through diet. Tr. 73
>
> At the September 10, 2001 hearing, plaintiff testified that she sometimes had reactions to rubber soles on shoes and sometimes she did not. Tr. 103. She had reaction to latex or rubber gloves, but not vinyl gloves. Tr. 102-103. She traveled by car service and asked the service to remove the car mats before they picked her up. Tr. 103. Her main problem was her latex allergy. Tr. 104. She also had diabetes, which was controlled with diet and a cardiac arrhythmia, which was controlled with medication. Tr. 104. She believed that Amiodarone, which she took for cardiac arrhythmia caused peripheral neuropathy. Tr. 104.
>
> . . . At the July 12, 2006 hearing, plaintiff reported that she visited her son, cooked her own food, and sometimes walked to the store to shop for food. Tr. 680-681. Plaintiff reported that her doctor recommended a cardiac catheterization, which she declined. Tr. 684. She had not been treated by an allergist because she feared having a lethal reaction to the testing. Tr. 685. She had never been to an emergency room for treatment of an anaphylactic reaction or any other reason. Tr. 682. Plaintiff believed that Amiodarone caused increased polyneuropathy and slowed her down. Tr. 688-89. Plaintiff testified that she stopped working in January 1997 because of her latex allergy. Tr. 695. Without the allergy she would have been able to continue working. Tr. 695.
>
> Plaintiff testified by telephone at the May 8, 2007 hearing. Tr. 723. She testified that her allergist, Dr. Bernstein, told her it was too dangerous to test her for latex allergy. Tr. 727. She reported that she made her home latex-free by throwing out her carpets. Tr. 741. She did not drive in cars unless the mats had been removed and the car was vacuumed. Tr. 741. Plaintiff testified that she could shop in a

store but had to leave if there was balloon in the store or if the cashier used gloves. Tr. 741-42.

Def. Opp. 2-4.

   B.   *Andrew Pasternak, defendant's non-testifying vocational expert*

Following the hearing on July 20, 2006, the ALJ requested interrogatory responses from defendant's vocational expert, Andrew Pasternak. Pasternak did not testify in person. Mr. Pasternak opined that plaintiff was capable of transferring her skills to a number of other jobs in a latex-free environment: customer service representative; insurance claims processing clerk; file clerk; receptionist; and administrative clerk. Tr. 747. Pasternak did not describe how he arrived at his conclusion that these occupations could be performed in "latex-free" environments, nor did he opine as to whether finding such an environment was even realistic. And Paternak was not asked, and offered no insight, into the impact of plaintiff's anxiety about possible exposure or her ability to find suitable employment.

   C.   *Benjamin Gastel, plaintiff's vocational consultant*

Plaintiff engaged her own vocational expert, Benjamin Gastel, who concluded that it is his "professional vocational opinion that at this time Ms. Rudt-Pohl is unable to perform any work in the national, regional, or local labor market." Tr. 320. He further noted that plaintiff "no longer can be considered a dependable or reliable employee in the competitive work market," and that "without dramatic medical improvement, Ms. Rudt-Pohl is disabled from performing any work in the market place." Tr. 321.

Gastel provided an "Addendum to Comprehensive Vocational Evaluation" on July 22, 2006, which contained similar conclusions. Gastel claimed that he learned from his 10 years

7

working in a hospital that "[l]atex allergy was a significant barrier for individuals in the professional group – nurses, doctors, et al., who became allergic to its use and had allergic reaction." Tr. 382. Moreover, Gastel stated that it was unrealistic to place plaintiff in a job, and then expect the employer to remove all potential sources of latex, including rugs. Tr. 383. He concluded that this most recent report contained similar conclusions as to plaintiff's employability, "except to highlight that Latex sensitivity is a major barrier for anyone such as Ms. Rudt-Pohl with an unpredictable anaphylactic reaction, returning to the world of work." Tr. 384. Gastel disagreed "with Mr. Pasternak's contention that there is any suitable working environment that is reasonably Latex-free." Tr. 379.

## DISCUSSION

### I. Standard of Review

The Court "may set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by 'substantial evidence' or if the decision is based on legal error." Burgess v. Astrue, 537 F.3d 117, 127 (2d Cir. 2008), *quoting* Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004), *quoting* Richardson v. Perales, 402 U.S. 389, 401 (1971) (internal quotation marks omitted).

### II. The ALJ's Decision

"Disability" within the meaning of the Social Security Act is defined as "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not

8

less than 12 months . . . ." 42 U.S.C. sec (d)(1)(A). Furthermore, a claimant is disabled only "if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . . ." 42 U.S.C. sec 423(d)(2)(A).

The Social Security Administration's familiar five-step process for the determination of disability is as follows:

> First, the Commissioner must determine whether the claimant is doing substantial gainful work. . . . Second, if claimant is not doing substantial gainful work, the Commissioner must determine whether her or she has a "severe impairment." . . . Third, if a severe impairment exists, the Commissioner must then consider medical evidence to determine if the claimant has an impairment listed in Appendix 1 of the regulations. . . . Fourth, if the claimant does not have a listed impairment, the Commissioner must analyze whether the impairment prevents the claimant from doing his or her past work. . . . Finally, if the claimant cannot perform past work, the Commissioner must determine whether the impairment prevents him or her from doing any other work. . . . If so, the Commissioner must find the claimant disabled.

Beckles v. Barnhart, 340 F. Supp. 2d 285, 287-288 (E.D.N.Y. 2004).

While the burden is on plaintiff during the first four steps, at the fifth and final step the burden shifts to the Commissioner, "who must produce evidence to show the existence of alternative substantial gainful work which exists in the national economy and which the claimant could perform, considering not only his physical capability, but as well his age, his education, his experience, and his training." Aubeuf v. Schweiker, 649 F.2d 107, 112 (2d Cir.1981). While in the "ordinary case . . . the Commissioner meets his burden at the fifth step by resorting to the applicable medical vocational guidelines (the grids)[,] . . . exclusive reliance on the grids is inappropriate where the guidelines fail to describe the full extent of a claimant's physical

limitations." Rosa v. Callahan, 168 F.3d 72, 78 (2d Cir. 1999) (internal citations omitted). In such a case, "the Commissioner must introduce the testimony of a vocational expert (or other similar evidence) that jobs exist in the national economy which claimant can obtain and perform." Id.

The ALJ determined that plaintiff did not engage in substantial gainful activity during the relevant period, and suffered from the following severe impairments: thyroid disease, diabetes, history of tachycardia and a latex allergy. Tr. 328. However, the ALJ further found that none of these impairments, either individually or in combination, met the criteria for a listed disability. Tr. 329.

The ALJ concluded that "through the date last insured, the claimant had the residual functional capacity to perform light work in a latex-free environment." Tr. 335. The ALJ discounted the reports of plaintiff's vocational expert, noting that "Mr. Gastel, a self-proclaimed vocational placement specialist, essentially submits a medical report outlining what he believes is the medical evidence which according to Mr. Gastel results in an assessment that claimant could not perform a full range of sedentary work." Tr. 338 The ALJ also discounted the residual functional capacity assessment prepared by plaintiff's treating internist, Dr. Rawlings, which concluded that plaintiff could perform only less-than-sedentary work activity. Tr. 334. The ALJ noted that Rawlings's statements were "conclusory in nature and unsupported by the evidence of record . . . ." Tr. 334.

In determining that there are a significant numbers of jobs available in the economy for plaintiff, the ALJ focused almost exclusively on the answers provided by defendant's vocational expert, Mr. Pasternak, who opined that plaintiff had a number of transferable skills that would

10

equip her to perform other jobs available in a latex-free environment. Tr. 337.

### III. Analysis of ALJ's Decision

Plaintiff has a very serious medical condition that clearly dominates her life. The majority of the non-medical evidence strongly suggests that plaintiff's latex allergy is indeed quite critical. Perhaps most telling is the incident that occurred immediately prior to the ALJ's hearing of April 24, 2006, when the ALJ himself noted on the record that plaintiff "had an attack of shortness of breath and wheezing . . . ," which plaintiff attributed to her latex sensitivity. Tr. 643. The ALJ stated that "[s]he can't stay in here[,]" and she left for the remainder of that day's hearing. As a result, she was forced to attend the next two hearings telephonically. Id. Defendant's own medical consultant, Dr. Gussoff, testified that he believed there was enough evidence, based largely on seeing plaintiff's attack in the hearing room, to conclude that plaintiff's latex allergy is significant. Tr. 707.

The ALJ concluded that plaintiff has a serious latex allergy. He then proceeded to articulate the one issue that separates the parties: "[F]rom a vocational point of view what is the realistic probability that in this lady's line of work, . . . or in any line of work to which her skills are transferable, she can be *guaranteed* a latex free environment." Tr. 715 (emphasis added). The ALJ continued: "That is really the issue that I have to decide, and in order to do that, since I'm not a vocational expert, and nobody here is, I need an input from a vocational expert." Tr. 715.

Unfortunately, that critical question was never answered. Defendant's vocational expert, Andrew Pasternak, provided only spare and conclusory responses to the ALJ's interrogatories. He stated that other jobs, such as a receptionist, customer service representative, and

11

administrative clerk, were available in "latex-free environments," (Tr. 747), but offered no explanation as to how he derived these conclusions. Pasternak similarly failed to describe his understanding of what constitutes a "latex-free" environment – again, a critical question in this case.

Dr. Mescon concluded that plaintiff's latex allergy required that she "should be nowhere near where latex is found." Tr. 531. More significant, however, is the extensive testimony provided by defendant's consulting medical expert, Dr. Gussoff, who based his frank appraisal of plaintiff's extreme latex sensitivity upon witnessing one of plaintiff's allergic episodes first-hand. Dr. Gussoff opined that her latex allergy threatens her life on a "moment to moment basis," and "can occur at any time without any warning, and without being aware of the noxious agent that precipitates the attack." Tr. 644. He added: "[A]ll it takes apparently is some residual latex particle whenever or wherever." Tr. 644. In a subsequent hearing, he suggested the virtual impossibility of guaranteeing plaintiff a latex-free environment, noting that plaintiff would be employable if such a place existed, but "that anyone, anywhere could walk into her workplace with latex." Tr. 715. In the Court's view, the ALJ's hearing room was precisely such a place – a seemingly latex-free environment that apparently became exceedingly perilous for plaintiff with the introduction of a relatively small amount of airborne latex.

The ALJ's conclusion cannot be sustained on the record before this Court. There is no evidence that as a practical matter demonstrates that a truly latex-free environment might be found in the common workplace.

## CONCLUSION

For the reasons stated above, plaintiff's motion for judgment the pleadings is granted, and defendant's motion is denied. The ALJ's decision is vacated, and the case is remanded for a calculation of benefits. The Clerk of the Court is directed to close this case.

SO ORDERED.

Dated: Brooklyn, New York
August 25, 2009

                                                s/ Judge Raymond J. Dearie
                                          RAYMOND J. DEARIE
                                          United States District Judge